AUSTIN TERM, 1892.

W. E. COBB v. J. C. WARD.

(No. 7232.)

APPEAL from Wichita County. Opinion by DAVIDSON, J.

J. H. COBB, counsel for appellant.

No counsel appeared for appellee.

§ 307. *Statute of frauds; promise to answer for the debt, etc., of another.* This suit was instituted by appellee against appellant in the justice court on a sworn account for $120.40. A sworn denial of the justness of the account was filed, and on the trial appellant recovered a judgment for his costs. Appellant prosecuted an appeal to the county court, and there recovered a judgment of $12. From this judgment appellant brings the case by appeal to this court. The account constituting the basis of the suit is for goods sold by appellee to one W. C. King. It is sought to hold the appellant liable for the debt sued for on an alleged verbal promise to pay the same for King. Appellant contends that he did not promise to pay the debt either verbally or in writing, and, if he did, it was a conditional verbal promise; that the condition upon which he was to be liable did not occur; and that the promise was in contravention of the statute of frauds, and therefore he could not be held responsible. King was not a party in any way to this agreement, and was never consulted about it, so far as the record discloses. This evidence shows that the account began October 29, 1887, and terminated February 24, 1888. The statement of facts, omitting the caption and formal parts, and the

statement of the account sued on, is as follows: Paul McLeod, by deposition: "I was in the employ of J. C. Ward from about the 10th day of November, 1886, to August, 1889, and while so employed I sold goods for plaintiff to W. C. King, and at the time I expected W. E. Cobb to see that they were paid for, for the reason that W. E. Cobb said that he would stand good for any reasonable amount of goods that I should sell to W. C. King. I have seen the account sued on. I sold the most, if not all, the goods to said W. C. King. I had a conversation with W. E. Cobb about the sale of said goods to W. C. King, some time during the fall of 1887 or winter of 1888, as well as I remember, on the sidewalk of the street near Marcus' store. I stated to Cobb that W. C. King had an account with J. C. Ward, and that they were looking to him for the money on same. Cobb stated to me that said King was not actually in his employ, but that King was a witness in an important lawsuit pending against him at that time, and that King was already in his debt, but that he would pay any reasonable account that King had contracted or should contract with J. C. Ward. I don't remember the articles I sold, but such as I sold I charged to W. C. King on the books of J. C. Ward." Plaintiff for himself testified: "W. E. Cobb promised to pay the account of W. C. King, which is sued upon in this case. About $108 of the account had been charged to King before I said anything to Cobb about it. I told Cobb King had an account with us. Called him back to the desk in my store, and showed it to him. He replied that King was getting badly in debt, and told me to hold him back as much as I could; to sell him just as little as I could. He said that King was an important witness for him in a suit he had pending at Ft. Worth, and that he would give him work as soon as work began, so as to keep him in the country, where he could get hold of him when his case was called for trial. For this purpose Cobb said he had guaranteed King

work for the year, and promised to pay the account."
This was all the testimony offered tending in any man-
ner to connect defendant with, or make him liable for,
the account sued upon.   The defendant testified as fol-
lows:   "The testimony of Paul McLeod and J. C. Ward
is true as far as it goes, but it doesn't go far enough.   It
is true, I wanted to keep King in the country to use him
as a witness in the lawsuit I had, and for that purpose I
turned·off other men and gave him work in preference
to others.   I guaranteed King work for the year.   When
Paul McLeod mentioned the account to me, I told him I
thought it was good, but to hold King back as much
as possible.   I further told him that I had employed
King for the year, and that I would pay the account as
soon as King worked it out, and I owed him that much
money.   It is a custom among cattlemen, was always
my custom, whenever any of my men make an account
in town to protect the account; that is, when I can, to see
that the man pays his accounts before I settle with him in
full.   I never did owe King anything during the short
time he was working for me, but he kept his wages
drawn ahead, and left suddenly for Montana, owing me
$65, which he has since sent me."   This was all the testi-
mony in the case.   Placing the testimony in the strongest
light possible for appellee, the promise of appellant was
that he "would pay any reasonable amount of goods
that" appellee "should sell to W. C. King."   This was
some time during the fall of 1887 or winter of 1888.   Be-
fore appellee ever mentioned the account of King to ap-
pellant, "about $108 of the account had been charged to
King."   This was a collateral undertaking, if an under-
taking at all, on the part of appellant, and before he
could be held responsible for this debt the promise should
have been in writing.   Appellant owed King nothing,
and there was no contract or agreement between the par-
ties by which King was to be released, and appellant to
be held liable for the debt, and appellant never at any

time had any funds of King in his hands.   [1 Civil Cas. Ct. App., § 908; 2 Civil Cas. Ct. App., § 436.]  We are of opinion that the evidence does not show any liability of appellant for the debt sued for, wherefore the judgment is reversed and the cause remanded.

April 23, 1892.                    Reversed and remanded.