Fred R. DUNAHUGH, Appellant,

v.

ENVIRONMENTAL SYSTEMS COMPA-
NY, A Delaware Corporation, and
Melvyn L. Bell, Appellees.

No. 93–3520.

United States Court of Appeals,
Eighth Circuit.

Submitted June 17, 1993.

Decided Aug. 12, 1993.

Robert Arthur Brunig, Minneapolis, MN,
argued (Robert A. Brunig and Joe Walters,
Minneapolis, MN, and Murray Miller, Phoe-
nix, AZ, on the brief), for appellant.

Joseph W. Anthony, Minneapolis, MN, argued (Joseph W. Anthony, Leslie Sinner McEvoy and Leny K. Wallen–Friedman, on the brief), for Environmental Systems Co.

John A. Cotter, Bloomington, MN, argued for appellee Melvyn L. Bell.

Before JOHN R. GIBSON, Circuit Judge, ROSS, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Fred Dunahugh appeals judgments of the trial court[1] that claims related to a stock sale and two stock transfers are barred by the statute of limitations. He also appeals a judgment of the trial court on a claim for breach of contract related to stock offerings. We affirm the judgments.

### I.

In 1972, Fred Dunahugh was the majority shareholder in Pollution Controls, Inc. (PCI), at that time a Minnesota corporation. Late that year, Melvyn Bell bought all but 25,000 shares of Mr. Dunahugh's stock in PCI and thus became the majority shareholder in the company. PCI grew through the years and eventually became part of Environmental Systems Company (ESC). The current value of ESC stock is considerable.

Mr. Dunahugh sued ESC and Mr. Bell in April, 1991. In that lawsuit, Mr. Dunahugh alleged that Mr. Bell had failed to pay all of the money due for Mr. Dunahugh's stock in PCI. The trial court granted summary judgment to the defendants on that claim in September, 1992, finding that it was barred by the statute of limitations.

Mr. Dunahugh also alleged that Mr. Bell had effected the transfer to himself of 68,500 shares of PCI stock that belonged to Mr. Dunahugh but had been assigned by him to the Micom Corporation, and that PCI and Mr. Bell had allowed that stock to be registered in Mr. Bell's name and had refused to return it. Mr. Dunahugh further alleged that Mr. Bell had effected the transfer to himself or others designated by him of 25,000 shares of PCI stock that actually belonged to Mr. Dunahugh but had been registered in the name of his wife, Jacqualyn Dunahugh, and subsequently assigned to a corporation called City Commodities, Inc. The trial court granted summary judgment to the defendants on those claims in September, 1992, finding them barred by the statute of limitations. Apparently in the alternative, the trial court also held that the challenges to the transactions were improper attacks on judicially approved sales.

Finally, Mr. Dunahugh alleged that PCI had breached a promise to offer stock options to Mr. Dunahugh whenever additional shares were offered for sale. The trial court granted summary judgment to the defendants on that claim in September, 1992, finding that Mr. Dunahugh had stated no claim against ESC, since the agreement in question was between only Mr. Bell and Mr. Dunahugh. The trial court also held that the allegations in that part of the complaint stated no claim against Mr. Bell, since the text did not charge him with any of the acts complained of.

### II.

In December, 1972, Mr. Dunahugh and Mr. Bell executed an agreement for the sale of Mr. Dunahugh's stock to Mr. Bell. Under that agreement, the final installment of the purchase price of $180,000 was due in December, 1975. The six-year limitations period for actions with respect to a breach of that contract, see Minn.Stat.Ann. § 541.05.-1(1), began to run, therefore, at that time. See, e.g., Bachertz v. Hayes–Lucas Lumber Co., 201 Minn. 171, 275 N.W. 694, 697 (1937). (We reject, as did the trial court, Mr. Dunahugh's contention that he did not know until later that Mr. Bell had failed to pay all of the money due. Mr. Dunahugh has offered no evidentiary support for that contention, either in the trial court or on appeal.)

In the trial court, Mr. Dunahugh argued that the limitations period was tolled because of the absence of Mr. Bell and PCI from the state and Mr. Dunahugh's subsequent inability to locate them despite a diligent search.

---

1. The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota.

In its opinion granting summary judgment to the defendants on the claim related to the stock sale, the trial court rejected those arguments. The trial court first noted that the state law that allows tolling, *see* Minn.Stat. Ann. § 541.13, applies only to defendants domiciled in the state who later change their domicile to another state. *See, e.g., Eliseuson v. Frayseth,* 290 Minn. 282, 187 N.W.2d 685, 688 (1971). The trial court found that no genuine issue of fact existed with respect to whether Mr. Bell had ever been domiciled in Minnesota. The trial court then declared that even if a genuine issue of fact existed on that point, no genuine issue of fact existed with respect to whether Mr. Dunahugh had conducted the diligent search for Mr. Bell and PCI that is required under the tolling statute, *see* Minn.Stat.Ann. § 541.13.

On appeal, Mr. Dunahugh argues that a genuine issue of fact exists both with respect to whether Mr. Bell ever became domiciled in Minnesota (and thus became subject to the tolling statute when he later changed his domicile to Arkansas) and with respect to whether Mr. Dunahugh conducted a diligent search for Mr. Bell and PCI. Mr. Dunahugh also appears to argue that because PCI failed to satisfy certain obligations imposed on corporations by Minnesota law, the limitations period should be tolled as to ESC, regardless of the diligence of his search for the company. We address each of those arguments in turn.

■ Under Minnesota law, to become domiciled in the state, a person must live there with the intention of remaining permanently. *See, e.g., Nelson v. Sandkamp,* 227 Minn. 177, 34 N.W.2d 640, 644–45 (1948); *see also* Minn.Stat.Ann. § 256D.02.12a, § 518.-003.2. As support for his contention that Mr. Bell became domiciled in Minnesota, Mr. Dunahugh offers three pieces of evidence. First, he notes that a June, 1973, report from PCI to its shareholders states that Mr. Bell (at that time a director and officer of PCI) currently lived in Minnesota. Second, Mr. Dunahugh cites a deposition given by Mr. Bell in June, 1974, in which Mr. Bell stated that his "present home address" was in Minnesota. Finally, Mr. Dunahugh refers to a deposition given by Mr. Bell in February,

1984, in which Mr. Bell stated that he "lived" for a "[c]ouple [of] years" in Minnesota.

This evidence, although slight, is enough, we believe, to create a genuine issue of fact on the question of whether Mr. Bell became domiciled in Minnesota (and therefore became subject to the tolling statute). The parties apparently do not dispute that after Mr. Bell left Minnesota, he was domiciled in Arkansas. We inquire in addition, then, whether the other requirements of the tolling statute have been satisfied as to Mr. Bell.

The statute declares that "if, after a cause of action accrues, [a defendant] departs from and resides out of the state and while out of the state is not subject to process under the laws of this state or after diligent search ... cannot be found for the purpose of personal service when personal service is required, the time of the [defendant's] absence is not part of the time limited for the commencement of the action." *See* Minn.Stat.Ann. § 541.13. Whether or not a diligent search has been conducted is a question of fact. *See, e.g., Duresky v. Hanson,* 329 N.W.2d 44, 49 (Minn.1983).

■ Mr. Bell argues that no reasonable person could conclude that Mr. Dunahugh conducted a diligent search in light of the facts that Mr. Bell testified as to his Arkansas whereabouts in a 1974 deposition taken in connection with a lawsuit in which Mr. Dunahugh was a defendant, that Mr. Dunahugh's lawyer represented Mr. Bell at that deposition, that in early 1975 the same lawyer acted as an intermediary between Mr. Bell and Mr. Dunahugh in obtaining replacement documents relating to stock transfers to Mr. Bell from Mr. Dunahugh, that PCI had a telephone listing in the Minneapolis-area directory through at least 1977, and, finally, that many creditors of PCI did locate both Mr. Bell and PCI during the 1970s. Mr. Dunahugh responds with an affidavit in which he states that he spoke with "stockbrokers and former employees" of PCI during the "mid to late 1970s" and learned that trading in PCI stock "had been suspended," that PCI had failed to make certain filings with the federal securities authorities, that PCI had "ceased operations" at its Minnesota facility, and that no telephone listing existed in the Minne-

apolis-area directory for either Mr. Bell or PCI.

It is true that several of the events cited by Mr. Bell occurred before December, 1975, when Mr. Dunahugh's cause of action accrued on the stock sale. We believe that even those events, however, would have given Mr. Dunahugh notice of how to find Mr. Bell after December, 1975. In light of the unrebutted facts offered by Mr. Bell relating to circumstances both before and after December, 1975, we agree with Mr. Bell that no *genuine* issue of fact is created by Mr. Dunahugh's affidavit. That is because, given the facts cited by Mr. Bell, we are convinced that no reasonable person could conclude that Mr. Dunahugh conducted a diligent search for Mr. Bell. *See, e.g., Cervantes v. Time, Inc.,* 464 F.2d 986, 994–95 (8th Cir.1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973), and *Lundeen v. Cordner,* 354 F.2d 401, 406–08 (8th Cir.1966); *see also* 10A C. Wright, A. Miller, and M. Kane, *Federal Practice and Procedure: Civil* 2d § 2727 at 143–45, 157–70 (1983).

We therefore hold that even if the question of Mr. Bell's domicile (and thus the applicability of the tolling statute) is assumed to be resolved in favor of Mr. Dunahugh, summary judgment for Mr. Bell is still appropriate, because no genuine issue of fact exists with respect to whether Mr. Dunahugh conducted a diligent search for Mr. Bell. The limitations period as to the claim against Mr. Bell related to the December, 1972, stock sale therefore began to run and was never tolled after December, 1975, when the last payment was due, and, accordingly, expired in December, 1981. Mr. Dunahugh did not file his lawsuit until 1991. Under these circumstances, the statute of limitations bars that claim against Mr. Bell. We turn, then, to the question of whether that claim is also barred against ESC.

The parties do not dispute that PCI was domiciled in Minnesota in mid–1974. The essence of Mr. Dunahugh's argument with respect to PCI seems to be that between June, 1977, and December, 1981 (when the limitations period, if not tolled, would have expired on the stock sale), PCI failed to maintain an office in Minnesota where it could be served with legal process, as required by state law; that, despite a diligent search, Mr. Dunahugh was unable to locate the company until January, 1990, when he learned that ESC was the successor to PCI; and therefore that the statute of limitations was tolled between mid–1977 and early 1990.

▪ Minnesota law does require that Minnesota corporations maintain an office in the state. *See* Minn.Stat.Ann. § 300.44, § 302A.121.1. Minnesota law also requires that Minnesota corporations file an annual registration with the state. *See* Minn.Stat. Ann. § 302A.821.1. While Minnesota statutes apparently provide no penalty for the failure to maintain an office in the state, the Minnesota courts have held that the failure to do so may result in a corporation's charter being vacated, nullifying the company's corporate existence. *See, e.g., State ex rel. Childs v. Park and Nelson Lumber Co.,* 58 Minn. 330, 59 N.W. 1048, 1049 (1894). The failure to file an annual registration with the state may result in the loss of good standing, *see* Minn.Stat.Ann. § 302A.821 subd. 3, or in corporate dissolution, *see* Minn.Stat.Ann. § 302A.821, subd. 5. We find no authority, however, for the proposition that any of those failures will toll the limitations period with respect to actions against Minnesota corporations.

The tolling statute, *see* Minn.Stat.Ann. § 541.13, does apply to corporations as well as to individuals. *See, e.g., Pomeroy v. National City Co.,* 209 Minn. 155, 296 N.W. 513, 514 (1941). Assuming for purposes of this opinion, then, that PCI could be deemed to have changed its domicile as of mid–1977, we must look at whether a genuine issue of fact exists with respect to the diligence of Mr. Dunahugh's search for the company. We conclude, based on the considerations noted earlier with respect to the diligence of Mr. Dunahugh's search for Mr. Bell, that no reasonable person could conclude that Mr. Dunahugh's search was diligent. The limitations period as to the claim against ESC related to the December, 1972, stock sale therefore began to run and was never tolled after December, 1975, when the last payment was due, and, accordingly, expired in December, 1981. Because Mr. Dunahugh did not file his law-

suit until 1991, the statute of limitations bars that claim against ESC. We therefore affirm the judgment of the trial court with respect to that claim.

## III.

In September, 1972, Mr. Dunahugh was elected to the board of directors of the Micom Corporation. A month later, the board authorized the filing of a bankruptcy petition for the reorganization of Micom. According to the minutes of the board, Mr. Dunahugh was present at that meeting. The corporation filed its bankruptcy petition in November, 1972. In the petition, Micom listed 68,-500 shares of PCI stock among its assets. Mr. Dunahugh's name does not appear in the lists of Micom creditors. In January, 1973, the bankruptcy court authorized Micom to sell the 68,500 shares of PCI stock. On August 27, 1973, the Micom board approved the sale to Mr. Bell of the 68,500 shares of PCI stock.

On August 30 or September 10, 1973, the bankruptcy court confirmed the plan of arrangement proposed by Micom (later bankruptcy court orders refer to both dates, but the confirmation order itself was filed on August 30, 1973). According to a November, 1973, letter from PCI's lawyers that was not challenged by Mr. Dunahugh, the bankruptcy court had approved in June, 1973, a provision in that plan that Micom would sell the 68,500 shares of PCI stock to Mr. Bell (the shares were not actually transferred to Mr. Bell until November, 1973). Mr. Dunahugh resigned from the board of Micom in late September, 1973, after the bankruptcy court had confirmed the plan of arrangement. In December, 1975, the bankruptcy court filed its final decree in relation to the Micom reorganization and closed the case.

According to Mr. Dunahugh, the 68,500 shares of PCI stock listed by Micom as its property actually belonged to Mr. Dunahugh and had been assigned to Micom only as a temporary accommodation to help Micom in obtaining a loan. Mr. Dunahugh alleged in his complaint, therefore, that the sale and transfer of those shares to Mr. Bell in November, 1973, amounted to conversion by both PCI and Mr. Bell.

In its opinion granting summary judgment to the defendants on that claim, the trial court held that as a director of Micom, Mr. Dunahugh had notice of Micom's claim of ownership of the shares of PCI stock as of January, 1973, and notice of the sale of those shares to Mr. Bell as of August 27, 1973. The trial court held that the limitations period of six years for conversion actions, *see* Minn.Stat.Ann. § 541.05.1(4), began to run in 1973 (at the time of the conversion), therefore, and expired in 1979. *See, e.g., Williams v. Davis,* 182 Minn. 186, 234 N.W. 11, 13–14 (1930).

As a director of Micom when the sale of the 68,500 shares of PCI stock was authorized, Mr. Dunahugh is presumed by Minnesota law to have known of that sale. *See, e.g., Schlozer v. Heckeroth,* 174 Minn. 525, 219 N.W. 921, 922–23 (1928). Mr. Dunahugh has presented no evidence whatsoever, other than his own affidavit, that the sale was somehow concealed from the board (which would be anomalous, in any event, since the board itself approved the sale) so as to toll the limitations period until 1990, when Mr. Dunahugh alleges he learned of the sale. *See, e.g., Williams,* 234 N.W. at 13–14. Under these circumstances, we hold that there is no *genuine* issue of fact with respect to concealment. *See, e.g., Cervantes v. Time, Inc.,* 464 F.2d 986, 994–95 (8th Cir.1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973), and *Lundeen v. Cordner,* 354 F.2d 401, 406–08 (8th Cir.1966); *see also* 10A C. Wright, A. Miller, and M. Kane, *Federal Practice and Procedure: Civil* 2d § 2727 at 143–45, 157–70 (1983).

The trial court was therefore correct in holding that the limitations period began to run in 1973 and expired in 1979. Since Mr. Dunahugh did not file his lawsuit until 1991, the statute of limitations bars the claim related to the sale of the 68,500 shares of PCI stock to Mr. Bell. The trial court was also correct in its alternative holding that Mr. Dunahugh's claim related to that sale is an untimely and, accordingly, improper collateral attack on a sale approved by the bankruptcy court. *See, e.g., In the Matter of Edwards,* 962 F.2d 641, 643–45 (7th Cir.1992),

and *In the Matter of Garfinkle,* 672 F.2d 1340, 1348 (11th Cir.1982). We thus adopt that alternative holding as well. We therefore affirm the judgment of the trial court with respect to the conversion claim involving the 68,500 shares of PCI stock.

## IV.

In late 1974, Mrs. Dunahugh executed a promissory note for $10,000 in favor of City Commodities, Inc. The face of the note indicates that it was secured by 25,000 shares of PCI stock. In early 1975, Mr. Dunahugh executed promissory notes totaling $25,000 in favor of City Commodities.

In late 1975, the federal commodities exchange authorities sued City Commodities in federal court, seeking the liquidation of the company. *See* 7 U.S.C. § 13a–1(a). The court appointed a temporary fiscal agent to effect the liquidation; as part of that liquidation, City Commodities sued both Mr. and Mrs. Dunahugh in mid–1976 to recover on the promissory notes and foreclose on the security. Default judgments against both Mr. and Mrs. Dunahugh were entered a few months later. Those judgments were never paid.

In mid–1978, as part of the liquidation proceedings for City Commodities, the temporary fiscal agent for the company petitioned the court for permission to sell to Mr. Bell the 25,000 shares of PCI stock that had secured the promissory note executed by Mrs. Dunahugh. The court granted the petition, and the 25,000 shares of PCI stock were subsequently sold to Mr. Bell (who evidently designated three other persons as the recipients of the shares).

According to Mr. Dunahugh, the 25,000 shares of PCI stock that had been pledged by Mrs. Dunahugh as security for her promissory note actually belonged to Mr. Dunahugh. He alleged in his complaint, therefore, that the sale of those shares to Mr. Bell amounted to conversion by both PCI and Mr. Bell.

In its opinion granting summary judgment to the defendants on that claim, the trial court held that when Mr. Dunahugh was served in May, 1976, in the suit foreclosing

on the security for the promissory notes, he had notice of City Commodities's claim of right to ownership (and thus right to disposal) of the 25,000 shares of PCI stock. The trial court held that the limitations period of six years for conversion actions related to those shares, *see* Minn.Stat.Ann. § 541.05.-1(4), began to run at that time, therefore, and expired in 1982. *See, e.g., Williams v. Davis,* 182 Minn. 186, 234 N.W. 11, 13–14 (1930).

The proof of service in the foreclosure action indicates that Mrs. Dunahugh was served personally by the marshal and that Mr. Dunahugh was served by the marshal's "leaving copies [of the summons and complaint] at [Mr. Dunahugh's] dwelling house or usual place of abode with some person of suitable age and discretion then residing therein," *see* Fed.R.Civ.P. 4(d)(1), namely, Mrs. Dunahugh. On appeal, Mr. Dunahugh has offered no rebuttal to the arguments that service upon him was proper and that the promissory note itself indicates that the 25,-000 shares of PCI stock were given as security for the note. We need not, therefore, consider the validity of the assignments purportedly executed separately.

Under these circumstances, the trial court was correct in holding that the limitations period began to run in 1976 and expired in 1982. Since Mr. Dunahugh did not file his lawsuit until 1991, the statute of limitations bars the claim related to the sale of the 25,000 shares of PCI stock to Mr. Bell. The trial court was also correct in its alternative holding that Mr. Dunahugh's claim related to that sale is an untimely and, accordingly, improper attack on a sale approved by the court in the liquidation action. *See, e.g., Insurance Company of North America v. Bay,* 784 F.2d 869, 873 (8th Cir.1986); *see also Cacka v. Gaulke,* 212 Minn. 404, 3 N.W.2d 791, 791–92 (1942), and *Flanery v. Kusha,* 147 Minn. 156, 179 N.W. 902, 903 (1920). We thus adopt that alternative holding as well. We therefore affirm the judgment of the trial court with respect to the conversion claim involving the 25,000 shares of PCI stock.

## V.

In late 1972, Mr. Dunahugh and Mr. Bell executed an agreement stating that in the

event Mr. Bell "call[ed] for PCI to issue shares, stock options or stock rights," Mr. Bell would "at the same time cause the corporation to offer ... shares, options or stock rights on the same terms" to Mr. Dunahugh. Mr. Dunahugh alleged in his complaint that PCI had breached that contract by failing to give Mr. Dunahugh the opportunity to purchase the company's stock every time it was offered for sale after late 1972.

In its opinion granting summary judgment to the defendants on that claim, the trial court held that the complaint failed to state a claim against either ESC or Mr. Bell. As to ESC, the trial court stated that the agreement was executed only by Mr. Bell and not by PCI. As to Mr. Bell, the trial court stated that the text of the complaint itself did not mention Mr. Bell and asserted no claim against him.

On appeal, Mr. Dunahugh contends with respect to ESC that the agreement in question should be considered part of a contract that consists, collectively, of 14 documents, all of which were executed on the same day and were related, as a practical matter, to the same transaction, namely, the sale of Mr. Dunahugh's stock to Mr. Bell contemporaneously with PCI's agreement to hire Mr. Dunahugh as a consultant. Mr. Dunahugh contends, therefore, that both ESC and Mr. Bell are bound by the agreement. With respect to Mr. Bell, Mr. Dunahugh concedes that his complaint may be inartfully drafted but argues that, generously construed, it can be interpreted as asserting a claim for breach of contract against Mr. Bell as well as against ESC. We consider each of those arguments in turn.

█ A close look at the documents cited by Mr. Dunahugh as collectively comprising one contract reveals that only Mr. Bell and Mr. Dunahugh were parties to the agreements related to the stock sale and that only PCI and Mr. Dunahugh were parties to the agreements related to the consulting arrangement. Mr. Bell did not sign any of the documents to which PCI was a party. Under these circumstances, the trial court was correct to treat as separate transactions the documents relating to the stock sale and to the consulting arrangement. *See, e.g., An-chor Casualty Co. v. Bird Island Produce, Inc.,* 249 Minn. 137, 82 N.W.2d 48, 54 (1957). We agree, therefore, with the trial court that Mr. Dunahugh has stated no claim against ESC in relation to the contract providing for the opportunity for Mr. Dunahugh to obtain additional PCI stock.

█ A close look at the complaint reveals that although several introductory paragraphs do mention Mr. Bell, they state no more than that Mr. Bell and Mr. Dunahugh executed the agreement relating to the stock sale and that Mr. Bell later became "the dominant shareholder" in PCI. In the specific count of the complaint relating to the alleged breach of contract with respect to the opportunity for Mr. Dunahugh to obtain additional PCI stock, all of the acts actually complained of are charged to PCI and ESC, not to Mr. Bell. As the trial court noted in its opinion granting summary judgment to the defendants on that claim, Mr. Dunahugh never moved to amend his complaint to charge Mr. Bell with those acts even after Mr. Bell moved for summary judgment on that claim. Under these circumstances, we agree with the trial court that Mr. Dunahugh failed to state a claim against Mr. Bell in that part of the complaint describing Mr. Dunahugh's allegations as to breach of contract relating to the opportunity for Mr. Dunahugh to obtain additional PCI stock. We therefore affirm the judgment of the trial court with respect to that claim.

## VI.

For the reasons stated, the judgments of the trial court are affirmed as to all of Mr. Dunahugh's claims.